UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JOSPEH BYERS,

                    Plaintiff,                                    Hon. Robert Holmes Bell

v.                                                                Case No. 1:13-CV-339

COMMISSIONER OF SOCIAL
SECURITY,

                    Defendant.
_____/

## REPORT AND RECOMMENDATION

          This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim

for Supplemental Security Income (SSI) benefits under Title XVI of the Social Security Act. Section

405(g) limits the Court to a review of the administrative record, and provides that if the

Commissioner's decision is supported by substantial evidence, it shall be conclusive. Pursuant to

28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings

of fact and recommendations for disposition of social security appeals, the undersigned recommends

that the Commissioner's decision be **affirmed**.


## STANDARD OF REVIEW

          The Court's jurisdiction is confined to a review of the Commissioner's decision and

of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and*

*Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security

case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 27 years of age on his alleged disability onset date. (Tr. 228). He possesses a ninth grade education and has no past relevant work experience. (Tr. 30, 45). Plaintiff applied for benefits on January 16, 2007, alleging that he had been disabled since December 31, 2005, due to a back injury and learning disabilities. (Tr. 228-30). Plaintiff's application was denied, after which time he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 107-227). On July 21, 2011, Plaintiff appeared before ALJ William Reamon with testimony being offered by Plaintiff, medical expert, Dr. Jeffrey Andert, and vocational expert, Susan Rowe. (Tr. 40-87). In a written decision dated August 26, 2011, the ALJ determined that Plaintiff was not disabled. (Tr. 20-31). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1-7). Plaintiff subsequently initiated this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL HISTORY

X-rays of Plaintiff's thoracic spine, taken February 23, 2007, revealed "suspected mild compression deformity of T11." (Tr. 393). X-rays of Plaintiff's lumbar spine, taken the same day, were "normal." (Tr. 399). On February 28, 2007, Plaintiff participated in a nerve conduction study the results of which were "consistent with moderate bilateral carpal tunnel syndrome." (Tr. 392). On March 8, 2007, Plaintiff participated in an MRI examination of his thoracic spine the results of which revealed "mild degenerative disc disease at the T10-T11 level which does not result in spinal cord compression nor neural foraminal narrowing." (Tr. 400). The results of this examination were otherwise "unremarkable." (Tr. 400).

3

On April 3, 2007, Plaintiff underwent bilateral carpal tunnel release surgery. (Tr. 420-22). Treatment notes dated April 11, 2007, indicate that Plaintiff "is overall qui[te] happy with the improvement, and only has some mild residual numbness in the middle finger." (Tr. 417).

On April 10, 2007, Plaintiff participated in a consultive examination conducted by Wayne Kinzie, Ph.D. (Tr. 423-28). Plaintiff reported that he was disabled due to depression and back pain. (Tr. 425). Plaintiff also reported that he suffers from a learning disability. (Tr. 425). The results of a mental status examination were unremarkable. (Tr. 426-28). Plaintiff participated in intelligence testing the results of which revealed that he possesses a verbal IQ of 83, a performance IQ of 80, and a full scale IQ of 80 which correlates with "the low average range of intellectual functioning." (Tr. 423-24). The doctor observed that Plaintiff's performance "indicate[s] some mild limitations," but that "overall, his intellectual abilities are adequate for a number of work tasks of a simple and routine nature." (Tr. 424). Plaintiff was diagnosed with "mild" dysthymic disorder and his GAF score was rated as 58.[1] (Tr. 428).

On April 18, 2007, Plaintiff participated in a consultive examination conducted by Dr. Tama Abel. (Tr. 430-36). Plaintiff reported that he was disabled due to back pain, obesity, depression, and learning disabilities. (Tr. 432). With respect to Plaintiff's appearance and mental status, the doctor observed the following:

> The patient is sitting comfortably in a chair and is in no obvious distress. He has no difficulty arising from the chair. Affect, dress, and effort are appropriate. Mental status is normal. The patient is cooperative in answering questions and following commands. The

---

[1] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 58 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

patient's immediate, recent, and remote memory is intact with normal concentration. The patient's insight and judgment are both appropriate. Patient provides a good effort during the examination.

(Tr. 433). The results of a musculoskeletal examination revealed the following:

There is no evidence of joint laxity, crepitus or effusion. Grip and pincher strength remain intact. Dexterity is unimpaired. The patient is able to pick up a coin, button clothing, and open a door. The patient is right-handed. He complains of pain in his back with bilateral knee extension at zero degrees and bilateral hip forward flexion at 45 degrees. Mild tenderness to palpation is noted over scars on the wrists bilaterally over the carpal tunnels. The patient has no difficulty getting on and off the examination table, no difficulty heel and toe walking, no difficulty squatting and arising, no difficulty balancing, no difficulty hopping, and no difficulty with the tandem walk.

(Tr. 433). The results of a neurological examination revealed the following:

Cranial nerves are intact. Motor strength and tone are normal. Decreased sensation on the tips of the third fingers bilaterally is present. Reflexes are intact and symmetrical. Romberg testing[2] is negative. The patient walks with a normal, but widebased, gait without the use of an assistive device. Straight leg raising is positive in the seated and supine positions as he complains of pain in his back. Finger-to-nose, heel-to-shin, and rapid alternating motions are normal. No radiating pain is elicited. Tinel's sign[3] and Phelen's maneuvers[4] are negative bilaterally.

---

[2] Romberg test is a neurological test designed to detect poor balance. *See* Romberg Test, available at http://www.mult-sclerosis.org/RombergTest.html (last visited on January 16, 2014). The patient stands with her feet together and eyes closed. The examiner will then push her slightly to determine whether she is able to compensate and regain her posture. *Id.*

[3] Tinel's test (or Tinel's sign) is performed to determine the presence of carpal tunnel syndrome. *See* Tinel's and Phalen's Tests, available at http://www.carpal-tunnel-symptoms.com/tinels-and-phalens-tests.html (last visited on January 16, 2014). Tinel's test is performed by tapping over the carpal tunnel area of the wrist with the palm up. A positive test causes tingling or paresthesia, and sometimes even a "shock type sensation," in the median nerve distribution. *Id.*

[4] Phalen's test is also used to determine the presence of carpal tunnel syndrome. *See* Tinel's and Phalen's Tests, available at http://www.carpal-tunnel-symptoms.com/tinels-and-phalens-tests.html (last visited on January 16, 2014). Phalen's test is performed by bending the patient's wrists downwards as far as they will comfortably go and pushing the backs of the hands together. The patient should hold this position for one minute. A positive test is indicated by numbness or tingling along the median nerve distribution. *Id.*

(Tr. 435). The doctor concluded that Plaintiff was experiencing degenerative disc disease and depression. (Tr. 436). With respect to the former, the doctor observed the following:

> This [degenerative disc disease] is most likely the greatest contribution to the patient's back discomfort. He complains of back pain with straight leg raising. No evidence of nerve root irritation is appreciated. His gait is normal; he does not require use of an assistive device when he ambulates. The patient is considered morbidly obese with a BMI of 55.4 and describes a sedentary lifestyle. Weight loss and institution of an exercise program may help improve some of his back pain. He is recovering from recent bilateral carpal tunnel surgery and is doing remarkably well with the speed of his recovery. Digital dexterity loss is not appreciated.

(Tr. 436). With respect to Plaintiff's depression, the doctor observed the following:

> No emotional instability is noted during examination today. The patient maintains good eye contact, has adequate concentration, and answers all questions appropriately. He is able to understand, carry out, and remember instructions, and respond appropriately to outside pressures.

(Tr. 436).

On May 24, 2007, Dr. John Pai completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 437-50). Determining that Plaintiff suffered from mild dysthymic disorder, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.04 (Affective Disorders) of the Listing of Impairments. (Tr. 438-46 ). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for this particular Listing. (Tr. 447). Specifically, the doctor concluded that Plaintiff experienced mild restrictions in the activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and never experienced extended episodes of decompensation. (Tr. 447).

6

On October 5, 2007, Plaintiff participated in a nerve conduction study the results of which revealed "significant" improvement compared with the examination performed prior to Plaintiff's carpal tunnel surgery. (Tr. 462). X-rays of Plaintiff's cervical spine, taken October 5, 2007, were "negative." (Tr. 480).

On November 7, 2007, Plaintiff participated in a sleep study the results of which revealed that Plaintiff was experiencing "mild to moderate obstructive sleep apnea." (Tr. 479). It was recommended to Plaintiff that he begin using a CPAP device. (Tr. 469). Treatment notes dated December 14, 2007, however, indicate that Plaintiff "has declined going on a CPAP machine." (Tr. 495).

On March 9, 2009, Plaintiff was examined by Dr. Kevin Fitzgerald with Michigan Pain Consultants. (Tr. 594). Plaintiff reported that he was experiencing "sharp and stabbing" back pain. (Tr. 594). Plaintiff reported that "taking five to six hydrocodone[5] 10 mg pills is like eating candy and it does nothing for his pain." (Tr. 594). The doctor concluded that "I am not convinced that long acting opioids are appropriate when we cannot [determine] any etiology for his pain." (Tr. 594).

On March 13, 2009, Plaintiff participated in a bone scan of his thorax and shoulders the results of which were "negative." (Tr. 597).

On May 18, 2009, Plaintiff was examined by Dr. Derek Lado with Michigan Pain Consultants. (Tr. 593). Plaintiff reported that he was suffering from back pain resulting from "multiple car accidents" and "possibly six to eight motorcycle accidents." (Tr. 593). Plaintiff also

---

[5] Hydrocodone is a narcotic pain reliever used to treat "moderate to severe pain." *See* Hydrocodone and Acetaminophen, available at http://www.drugs.com/hydrocodone.html (last visited on January 16, 2014).

reported that "he has fell off a roof a few times" and "been in literally hundreds of bar fights." (Tr.

593). Plaintiff reported that he was currently taking Norco[6] "up to six a day." (Tr. 593). A physical

examination revealed the following:

> Regarding his thoracic spine, he does have an extension restriction at
> about T8-T11 on the right. He also has pain at the right SI joint. He
> does not have any leg length discrepancy or pelvic asymmetry. He
> has full strength for bilateral shoulder flexion, shoulder abduction,
> elbow flexion, elbow extension, wrist flexion, wrist extension.
> Bilateral hip flexion, knee extension, ankle dorsiflexion, plantar
> flexion strength is intact. He has negative clonus[7] and downgoing
> Babinski.[8]

(Tr. 593).

On August 3, 2009, Plaintiff contacted his primary care physician requesting

additional medication. (Tr. 630). Plaintiff reported that he hurt his back while on vacation out of

state and would not be returning home for 15 more days. (Tr. 630). On September 2, 2009, Plaintiff

reported that he was able to walk 2-5 miles. (Tr. 627). Treatment notes dated September 16, 2009,

indicate that Plaintiff hurt his back while working on a friend's van. (Tr. 628).

On September 30, 2009, Plaintiff was examined by Dr. Lado. (Tr. 595). A physical

examination revealed areas of tenderness in Plaintiff's thoracic and lumbar spine, but was otherwise

unremarkable. (Tr. 595). Plaintiff reported that he sometimes takes "more than six" Norco tablets

---

[6] Norco is a "narcotic" pain medication prescribed to treat "moderate to severe pain." *See* Norco, available at http://www.drugs.com/norco.html (last visited on January 16, 2014).

[7] Clonus refers to a "series of fast involuntary [muscle] contractions" which can be caused by "an imbalance of signals from the central nervous system." *Spasticity*, available at http://www.webmd.com/pain-management/pain-management-spasticity (last visited January 21, 2014).

[8] Babinski test is a neurological test designed to discern damage to the central nervous system. *See* Babinski, available at http://www.medterms.com/script/main/art.asp?articlekey=7171 (last visited January 21, 2014). A downward response to Babinski testing is a "normal" or negative response. *See* Plantar Response, available at http://www.neuroexam.com/neuroexam/content.php?p=32 (last visited January 21, 2014).

a day.  (Tr. 595).  The doctor observed that Plaintiff "has had significant drug abuse in the past including abusing OxyContin, abusing crack cocaine, marijuana, etc." (Tr. 595).  The doctor concluded that Plaintiff was "a risky candidate for pain medication."  (Tr. 595).

Treatment notes dated November 20, 2009, indicate that Plaintiff recently splashed antifreeze on his face when he was "taking out a water pump from a car."  (Tr. 715).

On January 22, 2010, Larry Irey, Ph.D. completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations.  (Tr. 730-43).  Determining that Plaintiff suffered from a mood disorder and a personality disorder, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.04 (Affective Disorders) and Section 12.08 (Personality Disorders) of the Listing of Impairments.  (Tr. 731-39).  The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for these particular Listings.  (Tr. 740).  Specifically, the doctor concluded that Plaintiff experienced mild restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and never experienced extended episodes of decompensation.  (Tr. 740).

Dr. Irey also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation.  (Tr. 726-28).  Plaintiff's abilities were characterized as "moderately limited" in five categories.  (Tr. 726-27).  With respect to the remaining 15 categories, however, the doctor reported that Plaintiff was "not significantly limited."  (Tr. 726-27).

On February 17, 2010, Dr. Lado completed a report concerning Plaintiff's "ability to do physical work-related activities."  (Tr. 750-52).  The doctor reported that Plaintiff can, without

interruption, sit for 30 to 60 minutes, stand for 30 minutes, and walk for 30 minutes. (Tr. 750). The doctor reported that during an 8-hour workday, Plaintiff can sit, stand, and walk for no more than four hours total. (Tr. 750). The doctor reported that Plaintiff can occasionally lift/carry 10 pounds, can rarely lift/carry 20 pounds, and can never lift/carry 50 pounds. (Tr. 750). The doctor reported that Plaintiff can frequently perform handling, fingering, and pushing/pulling activities with his upper extremities. (Tr. 750). The doctor reported that Plaintiff can only occasionally bend, stoop, squat, kneel, crouch, crawl, and climb stairs. (Tr. 751). The doctor reported that Plaintiff's "experience of pain" would "frequently" interfere with his attention and concentration. (Tr. 751). The doctor also reported that Plaintiff would be absent from work "about four days per month" as a result of his pain. (Tr. 751-52).

On April 2, 2010, Eric Willmarth, Ph.D. completed an assessment of Plaintiff's ability to perform mental work-related activities. (Tr. 753-55). The doctor assessed Plaintiff's limitations in 17 separate categories encompassing: (1) making occupational adjustments; (2) making performance adjustments; and (3) making personal/social adjustments. (Tr. 753-54). In three of the categories, the doctor rated Plaintiff's limitations as "marked." (Tr. 753-54). In seven of the categories, Plaintiff's limitations were characterized as "moderate." (Tr. 753-54). Plaintiff's limitations were characterized as "mild" in two of the categories and no limitations were identified in the remaining four categories. (Tr. 753-54). The doctor also assessed Plaintiff's abilities in several areas of functioning. (Tr. 754-55). Specifically, the doctor determined that Plaintiff suffered from "extreme limitations" in the following areas: (1) activities of daily living; (2) maintaining social functioning; (3) maintaining concentration, persistence or pace; and (4) completing a normal work day and work week without interruptions from psychologically based symptoms. (Tr. 754-55). The

10

doctor also reported that Plaintiff experienced "marked limitations" in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary allowances. (Tr. 755).

On April 22, 2010, Plaintiff was administered the MMPI examination the results of which revealed the following:

> There was some questionable validity to the test, but it may be that he is truly in psychological distress. Furthermore, one scale reaffirmed that he may be being exhibitionistic about his symptoms. Joseph's highest scale was on Scale 3, Hysteria. People who score highly on this scale often have psychosomatic complaints and will often suffer from pain and bodily distress without any plausible organic cause. This also suggests that he has serious difficulties with insight about himself and about others. He also had an elevation on Scale 2, Depression, and Scale 4, Psychopathic Deviate. While interpreting the Depression scale, Joseph responded that he was unsure about what it meant. He reported that he is a "physical person, not a mind person." Scale 4 suggests that he is rebellious and has problems with authority. Given his past reported behavior, it is surprising that this scale was not more elevated.

(Tr. 796-97).

Treatment notes dated April 29, 2010, indicate that Plaintiff continued engaging in activities such as "moving heavy objects and working on cars." (Tr. 795). On May 12, 2010, Plaintiff reported that he was "planning on moving heavy objects" later that week. (Tr. 791).

Treatment notes dated December 1, 2010, indicate that Plaintiff's current medication regimen "is basically controlling his pain very well." (Tr. 845). Treatment notes dated January 25, 2011, indicate that Plaintiff's "pain medication does relieve his pain and does increase his activity." (Tr. 843). Treatment notes dated April 20, 2011 indicate that Plaintiff has been "compliant with" his medications which have "allow[ed] him to increase his function and activity." (Tr. 841).

Treatment notes dated October 5, 2011, indicate that Plaintiff's "medication allows him to increase activity and he tries to remain active." (Tr. 867).

On March 8, 2011, Plaintiff participated in a consultive examination conducted by Dr. R. Scott Lazzara. (Tr. 817-21). Plaintiff reported that he was disabled due to a "back injury," but conceded that "he has never had any surgical intervention" and "has not had any physical therapy." (Tr. 817). Plaintiff reported that he is able to drive, cook, "do chores," and walk his dogs. (Tr. 817). Plaintiff also reported that he visits his niece and plays video games. (Tr. 817). Plaintiff reported that he can sit for 10 minutes, stand/walk for 5 minutes, but "cannot lift anything more than 30 pounds." (Tr. 817). The results of a musculoskeletal examination revealed the following:

> There is no evidence of joint laxity, crepitance, or effusion. Grip strength remains intact. Dexterity is unimpaired. The patient could button clothing and open a door. The patient had no difficulty getting on and off the examination table, mild difficulty heel and toe walking, mild difficulty squatting, and mild difficulty hopping. Straight leg raising is negative. There is no paravertebral muscle spasm noted.

(Tr. 818). Plaintiff exhibited normal range of motion except in his cervical spine where his range of motion was minimally limited. (Tr. 818-20). The results of a neurological examination revealed the following:

> Cranial nerves are intact. Motor strength and tone are normal. Sensory is intact to light touch and pinprick. Romberg testing is negative. The patient walks with a wide based gait without the use of an assist device.

(Tr. 820). The doctor concluded that Plaintiff's "degree of impairment appears mild." (Tr. 821). Dr. Lazzara also completed an assessment of Plaintiff's ability to perform physical work activities. (Tr. 822-27). The doctor reported that Plaintiff can occasionally lift/carry up to 50 pounds. (Tr. 822). The doctor reported that during an 8-hour workday, Plaintiff can sit for six hours, stand for

four hours, and walk four hours.  (Tr. 823).  The doctor reported that Plaintiff can frequently perform handing, fingering, and feeling activities with his upper extremities.  (Tr. 824).  The doctor reported that Plaintiff can occasionally perform reaching and pushing/pulling activities with his upper extremities.  (Tr. 824).  The doctor reported that Plaintiff can occasionally balance, stoop, kneel, crouch, and climb stairs.  (Tr. 825).

On June 29, 2011, Plaintiff participated in a consultive examination conducted by Richard King, Ed.D.  (Tr. 830-35).  Plaintiff participated in intelligence testing the results of which revealed that he possesses a verbal IQ of 78, a perceptual reasoning IQ of 88, a working memory IQ of 77, a processing speed IQ of 79, and a full scale IQ of 77 which correlates with "the upper limits of the borderline range of intellectual functioning."  (Tr. 831).  Dr. King concluded that Plaintiff experiences "significant emotional dysfunctions combined with physical symptomatology."  (Tr. 834).  The doctor also assessed Plaintiff's abilities in 21 areas encompassing: (1) making occupational adjustments; (2) making performance adjustments; (3) making personal/social adjustments; and (4) functional limitations.  (Tr. 836-38).  The doctor reported that Plaintiff experienced "extreme" limitations in 4 categories, "marked" limitations in 11 categories, and "moderate" limitations in the remaining 6 categories.  (Tr. 836-38).

At the administrative hearing, Plaintiff testified that he often does not get out of bed or care for his personal needs due to his pain.  (Tr. 49).  Plaintiff also reported that it is a "daily occurrence" for him to experience episodes in which he simply forgets what he is doing.  (Tr. 50).  Plaintiff reported that two or three days a week he literally does nothing all day long.  (Tr. 50-51).  Plaintiff testified that his pain medication was not helping with his back pain.  (Tr. 51).  Plaintiff reported that he experiences shortness of breath and difficulty breathing.  (Tr. 54).  Plaintiff reported

that he experiences pain in his hands and wrists and experiences difficulty gripping and grasping things. (Tr. 54).

Jeffrey Andert, Ph.D., a clinical psychologist, also testified at the administrative hearing. (Tr. 43-44). Dr. Andert testified that Plaintiff experiences four separate "issues" with regard to his psychological functioning: (1) "mild to moderate" dysthymic disorder; (2) personality disorder, not otherwise specified; (3) borderline intellectual functioning which imposes "slight intellectual limitations;" and (4) history of polysubstance abuse. (Tr. 61-62). The doctor testified that Plaintiff experienced mild restrictions in activities of daily living; marked difficulties with social interaction; moderate deficiencies in concentration, persistence, and pace. (Tr. 63). The doctor further reported that Plaintiff has never experienced episodes of deterioration or decompensation. (Tr. 63). Dr. Andert concluded that Plaintiff's impairments did not satisfy the requirements of any impairment identified in the Listing of Impairments. (Tr. 62).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[9] If the Commissioner can make a

---

[9] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can

dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable to perform his previous work, and cannot, considering his age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five of the sequential evaluation process, Plaintiff bears the burden of proof through step four of the procedure, the point at which his residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffers from (1) chronic low back pain syndrome; (2) mild bilateral carpal tunnel syndrome; (3) affective disorder (mild to moderate dysthymic disorder); (4) personality disorder NOS with antisocial traits; (5) borderline intellectual functioning; and (6) polysubstance abuse/opioid dependence, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 23-27).

---

be performed (20 C.F.R. 404.1520(f)).

The ALJ next determined that Plaintiff retained the capacity to perform medium work[10] subject to the following limitations: (1) he can lift/carry 50 pounds occasionally and 25 pounds frequently; (2) in an 8-hour workday with normal breaks, he can, without interruption, stand for 30 minutes, walk for 30 minutes, and sit for one hour; (3) in an 8-hour workday with normal breaks, he can stand for four hours, walk for four hours, and sit for six hours; (4) he can use both hands for occasional reaching, including overhead, and pushing/pulling; (5) he can frequently use both hands for handling, fingering, and feeling; (6) he can occasionally use both feet for operating foot controls; (7) he can occasionally balance, stoop, kneel, crouch, and climb ramps/stairs; (8) he is restricted from climbing ladders, ropes, or scaffolds; (9) he can occasionally work around moving mechanical parts and operate a motor vehicle; (10) he should never work at unprotected heights or with his upper extremities exposed to vibration; (11) he is limited to simple, routine, and repetitive tasks; (12) he should not engage in jobs requiring (a) interaction with the general public, (b) more than occasional interaction with supervisors, or (c) more than minimal interaction with co-workers; (13) he can adjust to occasional changes in the work setting or process; and (14) he would likely be absent or tardy 6-12 times annually.  (Tr. 27).

Because Plaintiff has no past relevant work, the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, his limitations notwithstanding.  *See Richardson*, 735 F.2d at 964.  While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform

---

[10]  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  20 C.F.R. § 404.1567(c).

specific jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Susan Rowe.

The vocational expert testified that there existed in the state of Michigan approximately 9,500 jobs at the medium level of exertion and approximately 17,200 jobs at the light level of exertion which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 71-75). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). The ALJ concluded, therefore, that Plaintiff was not entitled to disability benefits.

I.          **The ALJ Complied with the Order from the Appeals Council**

In July 2009, a decision was issued by an ALJ regarding Plaintiff's current claim for benefits. (Tr. 124). That decision was appealed to the Appeals Council which remanded the matter to ALJ Reamon. (Tr. 124-27). In its remand order the Appeals Council noted the existence of "a prior Administrative Law Judge's decision dated September 24, 1998." (Tr. 124). As the Appeals Council further observed:

> The certified electronic folder does not contain the [1998] hearing decision or the exhibits of record. The [2009] decision does not mention the prior decision or contain rationale explaining which findings from the prior decision remain binding and which do not as required under Acquiescence Rulings 98-3(6), *Dennard v. Secretary of Health and Human Services* and 98-4(6), *Drummond v. Commissioner of Social Security.*

(Tr. 124).

The Appeals Council, therefore, instructed ALJ Reamon on remand to "apply Acquiescence Rulings 98-3(6) and 98-4(6)" with respect to the 1998 decision. (Tr. 124). In other words, ALJ Reamon was tasked with assessing the preclusive effect, if any, of the 1998 ALJ decision. Plaintiff alleges that he is entitled to relief because the ALJ "failed to consider the effects of res judicata on the Plaintiff's current application for benefits." The Court disagrees.

### A.      *Dennard v. Secretary of Health and Human Services*

In *Dennard v. Secretary of Health and Human Services*, 907 F.2d 598 (6th Cir. 1990), Dennard filed an application for benefits which was eventually denied on the ground that while he could no longer perform his past relevant work, he retained the ability to perform sedentary work which existed in significant numbers. *Id.* at 598-99. Dennard later submitted another application for benefits. This latter application was denied by an ALJ on the ground that Dennard *could* perform his past relevant work. *Id.* at 599. An appeal of this decision to federal district court was unsuccessful. The Sixth Circuit reversed the district court and ordered that the matter be remanded for further consideration. *Id.* at 600. Specifically, the court held that the latter ALJ was estopped, on res judicata grounds, from contradicting the prior determination that Plaintiff was unable to perform his past relevant work. *Id.*

18

B.    *Drummond v. Commissioner of Social Security*

In *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997), Drummond filed an application for benefits which was denied based on a finding that while she could no longer perform her past relevant work she could perform sedentary work which existed in significant numbers. *Id.* at 838. Drummond later filed another application for benefits which was denied based on the finding that she retained the ability to perform medium work. *Id.* at 838-39. After unsuccessfully appealing the matter in federal district court, Drummond pursued the matter in the Sixth Circuit. *Id.* at 839-40. Based, in part, on the *Dennard* decision, the *Drummond* court held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Id.* at 840-42. Thus, if an earlier ALJ makes a finding regarding a claimant's RFC, a later ALJ is bound by that RFC determination absent evidence to the contrary. *See, e.g., Gay v. Commissioner of Social Security*, 520 Fed. Appx. 354, 356 (6th Cir., Apr. 2, 2013).

C.    Acquiescence Rulings 98-3(6) and 98-4(6)

Finding that *Dennard* and *Drummond* conflicted with Social Security policy, the Social Security Administration issued, on the same day, Acquiescence Rulings 98-3(6) and 98-4(6). *See* Acquiescence Ruling 98-3(6), 1998 WL 274051 (Soc. Sec. Admin., June 1, 1998); Acquiescence Ruling 98-4(6), 1998 WL 274052 (Soc. Sec. Admin., June 1, 1998). With respect to how *Dennard* and *Drummond* differed from Social Security policy, the Social Security Administration observed:

> Under SSA policy, if a determination or decision on a disability claim
> has become final, the Agency may apply administrative res judicata
> with respect to a subsequent disability claim under the same title of

the Act if the same parties, facts and issues are involved in both the prior and subsequent claims. However, if the subsequent claim involves deciding whether the claimant is disabled during a period that was not adjudicated in the final determination or decision on the prior claim, SSA considers the issue of disability with respect to the unadjudicated period to be a new issue that prevents the application of administrative res judicata. Thus, when adjudicating a subsequent disability claim involving an unadjudicated period, SSA considers the facts and issues de novo in determining disability with respect to the unadjudicated period.

Acquiescence Ruling 98-3(6), 1998 WL 274051 at 29771; Acquiescence Ruling 98-4(6), 1998 WL 274052 at 29773.

As the Social Security Administration recognized, the *Dennard* and *Drummond* decisions conflicted with Social Security policy. Specifically, the Sixth Circuit concluded that where a final decision by the Social Security Administration contains findings regarding the claimant's ability to perform his past relevant work (*Dennard*) or the claimant's residual functional capacity (*Drummond*), the Administration "may not make a different finding in adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim unless new and additional evidence or changed circumstances provide a basis for a different finding." Acquiescence Ruling 98-3(6), 1998 WL 274051 at 29771; Acquiescence Ruling 98-4(6), 1998 WL 274052 at 29773.

Accordingly, the Social Security Administration concluded that it would apply *Dennard* and *Drummond*, within the Sixth Circuit, thusly:

When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence

20

relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

Acquiescence Ruling 98-3(6), 1998 WL 274051 at 29771; Acquiescence Ruling 98-4(6), 1998 WL 274052 at 29773. In other words, the Social Security Administration adopted, with respect to applications brought within the geographic territory of the Sixth Circuit, the holdings in *Dennard* and *Drummond*.


        D.      The ALJ's Res Judicata Assessment

In his decision denying Plaintiff's claim, ALJ Reamon acknowledged his task to "consider the prior hearing decision of September 24, 1998, as required under Acquiescence Rulings 98-3(6) , *Dennard v. Secretary of Health and Human Services*, 98-4(6), *Drummond v. Commissioner of Social Security*." (Tr. 20). As the ALJ observed, however, he could not accomplish this task because he "does not have access to the prior hearing decision." (Tr. 20). As the ALJ noted, and the record confirms, by the time the matter was remanded to ALJ Reamon, the "paper file containing [the September 24, 1998 decision] was destroyed per regulatory guidelines." (Tr. 384). Plaintiff does not dispute the accuracy of this evidence. Plaintiff, likewise, identifies absolutely no authority supporting his assertion that he is entitled to relief on the ground that the ALJ failed to consider a prior decision which no longer exists. Furthermore, Plaintiff makes no argument that ALJ Reamon's decision in any way conflicts or is contrary to the September 24, 1998 decision.

The Social Security Administration has promulgated a Program Operations Manual System (POMS), the purpose of which is to provide "internal guidance" to ALJs and other Social Security personnel. *See Robinson v. Commissioner of Social Security*, 2012 WL 4450288 at *8

21

(E.D. Mich., Sept. 26, 2012) (citation omitted). The POMS provides guidance concerning this particular issue. Specifically, the POMS provides that if a "prior folder," which should be assessed as part of a subsequent application for benefits, is "lost or destroyed," the ALJ should simply "consider all available evidence." *See* POMS DI 27510.005, Subsequent Claim Filed, available at https://secure.ssa.gov/apps10/poms.NSF/lnx/0427510005 (last visited on January 16, 2014). There is no indication, and no argument by Plaintiff, that the Commissioner failed to consider all the available evidence when ruling on Plaintiff's claim. In the absence of any authority by Plaintiff entitling him to relief under these circumstances, the Court is simply not persuaded that Plaintiff is entitled to relief on the ground that the ALJ failed to perform a task which was simply not possible to perform.[11]

In the alternative, the Court rejects Plaintiff's argument because the ALJ's decision does not conflict with *Dennard* or *Drummond* and by extension, therefore, Acquiescence Ruling 98-3(6) or Acquiescence Ruling 98-4(6). As discussed above, *Dennard* stands for the proposition that if an earlier decision concludes that a claimant is unable to perform his past relevant work, a subsequent ALJ cannot find that the claimant can perform his past relevant work absent new evidence to the contrary. As ALJ Reamon determined, Plaintiff has no past relevant work. Thus, the present decision does not run afoul of *Dennard*. The *Drummond* decision, on the other hand, stands for the proposition that a subsequent ALJ is bound by a previous RFC determination absent new evidence to the contrary. As discussed above, ALJ Reamon found that Plaintiff retains the

---

[11] While Plaintiff has not addressed the POMS in his pleadings, in the event that Plaintiff subsequently argues that he is entitled to relief because the ALJ did not comply with the aforementioned POMS provision, the undersigned recommends that any such argument be rejected. First, the Court does not discern inconsistency between the POMS and the ALJ's actions. More importantly, the alleged failure to comply with the POMS is not a basis for relief in this matter. *See Robinson*, 2012 WL 4450288 at *8 (the POMS "do not bind the Commissioner" and the failure by an ALJ to comply with the POMS is not a basis for reversing an ALJs decision).

ability to perform a limited range of medium work. Even if the 1998 decision was based on a more restrictive RFC, the evidence in this matter, as detailed above, is more than sufficient to justify any deviation from the previous RFC. Accordingly, this argument is rejected.

## II.        The ALJ Properly Evaluated the Medical Evidence

As detailed below, Plaintiff argues that the ALJ failed to afford appropriate consideration to the opinions of several of his care providers.

### A.        Dr. Lado

As noted above, on February 17, 2010, Dr. Lado completed a report concerning Plaintiff's physical abilities. The doctor reported that Plaintiff can, without interruption, sit for 30 to 60 minutes, stand for 30 minutes, and walk for 30 minutes. The doctor reported that during an 8-hour workday, Plaintiff can sit, stand, and walk for no more than four hours total. The doctor reported that Plaintiff can occasionally lift/carry 10 pounds, can rarely lift/carry 20 pounds, and can never lift/carry 50 pounds. Dr. Lado also reported that Plaintiff's "experience of pain" would "frequently" interfere with his attention and concentration and, moreover, that Plaintiff would be absent from work "about four days per month" as a result of his pain. The ALJ afforded "little weight" to Dr. Lado's opinion. Plaintiff asserts that he is entitled to relief because the ALJ failed to articulate sufficient reasons for not affording controlling weight to Dr. Lado's opinion.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, give

controlling weight to the opinion of a treating source if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record." *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375-76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* (quoting *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the physician's opinions "are not well-supported by any objective findings and are inconsistent with

24

other credible evidence" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Gayheart*, 710 F.3d at 376-77.

If the ALJ affords less than controlling weight to a treating physician's opinion, the ALJ must still determine the weight to be afforded such. *Id.* at 376. In doing so, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *Id.* (citing 20 C.F.R. § 404.1527). While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the ALJ considered those factors relevant to her assessment. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007).

The ALJ clearly articulated his reasons for affording less than controlling weight to Dr. Lado's opinion. The ALJ noted that Dr. Lado's opinion was contrary to the results of various objective medical testing, a conclusion well supported by the record as detailed above. The ALJ also noted that Dr. Lado's opinion was inconsistent with Plaintiff's reported activities, which as detailed above are rather substantial. In sum, there exists substantial evidence to support the ALJ's decision to afford little weight to Dr. Lado's opinion.

B.     Dr. Lazzara

As previously noted, on March 8, 2011, Plaintiff participated in a consultive examination conducted by Dr. Lazzara. Following a physical examination, the doctor concluded that Plaintiff's "degree of impairment appears mild." The doctor also completed an assessment of

Plaintiff's ability to function. In this regard, Dr. Lazzarra's opinion differs from the ALJ's RFC determination in one respect. Dr. Lazzara concluded that Plaintiff can occasionally lift/carry up to 50 pounds. The ALJ, on the other hand, concluded that Plaintiff can occasionally lift/carry 50 pounds, but can also frequently lift/carry up to 25 pounds. The ALJ accorded "significant weight" to Dr. Lazzara's opinion. (Tr. 29). Plaintiff asserts that he is entitled to relief because (1) the ALJ afforded greater weight to the opinion of a consultive examiner (Dr. Lazzara) than the opinion of Plaintiff's treating physician (Dr. Lado), and (2) the ALJ failed to explain why he rejected Dr. Lazzara's conclusion that Plaintiff could only occasionally (rather than frequently) lift/carry 25 pounds.

As previously discussed, Dr. Lado's opinion was not supported by the objective medical evidence and was inconsistent with other substantial evidence of record. On the other hand, Dr. Lazzara's opinion is supported by the objective medical evidence and is consistent with substantial evidence of record, including Plaintiff's reported activities. Moreover, as Dr. Lazzara was not a treating physician the ALJ was not required to provide a detailed explanation as to why he declined to adopt one particular aspect of the doctor's assessment. The ALJ did not adopt Dr. Lazzara's opinion, but simply afforded it significant weight as it is entirely consistent with the evidence of record. The ALJ's conclusion that Plaintiff retains the ability to frequently lift/carry 25 pounds is supported by substantial evidence including the results of Dr. Lazzara's examination of Plaintiff. The ALJ's assessment of Dr. Lazzara's opinion is supported by substantial evidence.

C.    Dr. Willmarth

As discussed above, on April 2, 2010, Dr. Willmarth completed an assessment of Plaintiff's non-exertional limitations. The doctor concluded that Plaintiff suffers from "extreme limitations" in the following areas: (1) activities of daily living; (2) maintaining social functioning; (3) maintaining concentration, persistence or pace; and (4) completing a normal work day and work week without interruptions from psychologically based symptoms. The ALJ assigned "marginal" weight to this opinion. Plaintiff asserts that the ALJ improperly rejected Dr. Willmarth's opinion.

As the ALJ recognized, Dr. Willmarth appears to have actually examined Plaintiff on only one occasion with the remainder of Plaintiff's counseling sessions being conducted by Amber Larson, a student intern. (Tr. 785-816). As the ALJ further observed, neither Larson's treatment notes nor the results of objective psychological testing support the extreme limitations identified by Dr. Willmarth. The ALJ also relied on the testimony of medical expert, Dr. Jeffrey Andert. Dr. Andert testified at the administrative hearing that an individual with a GAF score of 45, which Dr. Willmarth assigned to Plaintiff, "requires a very intensive level of treatment" and "[i]t's a level that you often see when people are hospitalized for psychiatric problems." (Tr. 67). As the ALJ correctly observed, Plaintiff's treatment was not intensive, but was instead rather conservative. The doctor's extreme opinion is likewise inconsistent with Plaintiff's reported activities. The ALJ's decision to afford marginal weight to Dr. Willmarth's opinion is supported by substantial evidence.

D.    Dr. King

As discussed above, Dr. King, following a single consultive examination, concluded that Plaintiff experienced "extreme" and "marked" limitations in most areas of functioning in

contrast to the ALJ's RFC determination. The ALJ assigned "little weight" to this opinion. Plaintiff asserts that he is entitled to relief because the ALJ assigned more weight to the opinions expressed by Dr. Andert at the administrative hearing.

As the ALJ concluded, Dr. King appears to have placed great reliance on Plaintiff's subjective statements. Moreover, the ALJ observed that Dr. King's opinion is not supported by the evidence of record and is even contradicted by several of Dr. King's contemporaneous observations. The ALJ's decision to place greater weight on the opinions expressed by Dr. Andert is supported by the evidence of record as discussed above. The ALJ's decision to afford little weight to Dr. King's opinion is supported by substantial evidence.

### III.        The ALJ Properly Discounted Plaintiff's Subjective Allegations

As discussed above, Plaintiff testified at the administrative hearing that he was impaired to extent well beyond that recognized by the ALJ. Plaintiff asserts that he is entitled to relief because the ALJ improperly discounted his subjective allegations.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added); *see also*, *Grecol v. Halter*, 46 Fed. Appx. 773, 775 (6th Cir., Aug. 29, 2002) (same). As the relevant Social Security regulations make clear, however, a claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled." 20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)) *Hash v. Commissioner of Social Security*, 309 Fed.

Appx. 981, 989 (6th Cir., Feb. 10, 2009). Instead, as the Sixth Circuit has established, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted). This standard is often referred to as the *Duncan* standard. *See Workman v. Commissioner of Social Security*, 105 Fed. Appx. 794, 801 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony"). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must

stand.  The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should

not be lightly disregarded.  *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780

(6th Cir. 1987).  In fact, as the Sixth Circuit recently stated, "[w]e have held that an administrative

law judge's credibility findings are virtually unchallengeable."  *Ritchie v. Commissioner of Social

Security*, - - - Fed. Appx. - - -, 2013 WL 5496007 at *3 (6th Cir., Oct. 4, 2013) (citation omitted).

The ALJ found Plaintiff to be "less than credible."  (Tr. 28).  The ALJ's assessment

was based on the ground Plaintiff's allegations were inconsistent with the objective medical evidence

and Plaintiff's reported activities.  The ALJ also noted that Plaintiff's "rather anemic work record"

reflected "a lack of motivation" which negatively impacted his credibility.  *See, e.g., Matula v.*

*Commissioner of Social Security*, 2013 WL 6713829 at *7 (E.D. Mich., Dec. 20, 2013) (it is

"appropriate for ALJ to consider poor work history when evaluating credibility").  While there is no

question that Plaintiff suffers from a certain level of functional limitation, as the ALJ recognized,

neither the medical evidence nor Plaintiff's reported activities support Plaintiff's subjective

allegations.  The Court concludes, therefore, that the ALJ's decision to accord limited weight to

Plaintiff's subjective allegations is supported by substantial evidence.


**IV.**          **The ALJ Properly Considered Plaintiff's Obesity**

Finally, Plaintiff argues that the ALJ failed to properly consider his obesity when

determining his residual functional capacity.  The ALJ recognized that Plaintiff is obese, but

considered this a non-severe impairment.  (Tr. 24).  It is not clear whether Plaintiff is challenging

the ALJ's decision that Plaintiff's obesity does not constitute a severe impairment or arguing that

the ALJ's assessment of his obesity is improper. This lack of clarity is, ultimately, irrelevant as neither argument is persuasive.

At step two of the sequential disability analysis articulated above, the ALJ must determine whether the claimant suffers from a severe impairment. The Sixth Circuit has held that where the ALJ finds the presence of a severe impairment at step two and proceeds to continue through the remaining steps of the analysis, the alleged failure to identify as severe some other impairment constitutes harmless error so long as the ALJ considered the entire medical record in rendering his decision. *See Maziarz v. Sec'y of Health and Human Services*, 837 F.2d 240, 244 (6th Cir. 1987); *Kirkland v. Commissioner of Social Security*, 528 Fed. Appx. 425, 427 (6th Cir., May 22, 2013) ("so long as the ALJ considers all the individual's impairments, the failure to find additional severe impairments. . .does not constitute reversible error"); *Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir., Feb. 22, 2008) (same); *Fisk v. Astrue*, 253 Fed. Appx. 580, 583-84 (6th Cir., Nov. 9, 2007) (same).

Here, the ALJ determined that Plaintiff suffered from a severe impairment at step two of the sequential analysis and continued with the remaining steps thereof, considering in detail the medical evidence of record. The record does not support the contention that Plaintiff's obesity imposes on him any limitations which are inconsistent with his RFC. Thus, even if it is assumed that the ALJ erred in failing to find that Plaintiff's obesity constituted a severe impairment, such does not call into question the substantiality of the evidence supporting the ALJ's decision. This argument is, therefore, rejected. *See Shinseki v. Sanders*, 556 U.S. 396, 407 (2009) (recognizing that the harmless error doctrine is intended to prevent reviewing courts from becoming "impregnable citadels of technicality"); *Heston v. Commissioner of Social Security*, 245 F.3d 528, 535-36 (6th Cir. 2001)

(recognizing that remand to correct an error committed by the ALJ unnecessary where such error was harmless); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("no principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"); *Berryhill v. Shalala*, 1993 WL 361792 at *7 (6th Cir., Sep. 16, 1993) ("the court will remand the case to the agency for further consideration only if 'the court is in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed from the picture...'").

To the extent that Plaintiff argues that the ALJ failed to comply with Social Security Ruling 02-1p, Titles II and XVI: Evaluation of Obesity, 2000 WL 628049 (S.S.R., Sept. 12, 2002), the result is the same. As the Sixth Circuit has made clear, Social Security Ruling 02-1p "does not mandate a particular mode of analysis, but merely directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation." *Nejat v. Commissioner of Social Security*, 359 Fed. Appx. 574, 577 (6th Cir., Dec. 22, 2009) (citation omitted); *see also*, *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 412 (6th Cir., Jan. 31, 2006) ("[i]t is a mischaracterization to suggest that Social Security Ruling 02-01p offers any particular procedural mode of analysis for obese disability claimants"). The ALJ recognized that Plaintiff is obese and analyzed the entire record in assessing Plaintiff's residual functional capacity. The ALJ's RFC determination sufficiently accounts for Plaintiff's obesity and the limitations reasonably imposed by such. This argument is, therefore, rejected.

**<u>CONCLUSION</u>**

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within such time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date: January 27, 2014                          /s/ Ellen S. Carmody
                                                ELLEN S. CARMODY
                                                United States Magistrate Judge